**E-Filed 4/22/09**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

FREDERICK N. BURGENER,

Plaintiff,

v.

UNION PACIFIC CORPORATION,

Defendant.

Case Number C 07-5160 JF (HRL)

ORDER[1] (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND (2) DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

[re: doc. nos. 42 & 44]

Defendant Union Pacific Railroad Company ("Union Pacific") moves for summary judgment on the claim of Plaintiff Frederick Burgener ("Burgener") for retaliation in violation of 38 U.S.C. § 4311(b) of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301, *et seq*. Burgener seeks summary judgment with respect to his claim that Union Pacific willfully discriminated against him on the basis of his military status in violation of 38 U.S.C. § 4311(a) and § 4323(d)(1)(C). The Court has considered the moving and responding papers and the oral arguments made at the hearing on April 17, 2009. For the reasons

[1] This disposition is not designated for publication in the official reports.

set forth below, Union Pacific's motion will be granted and Burgener's motion will be denied.

## I. BACKGROUND

Burgener has served as a member of the Army Reserves since 1984. Quinn Decl. Ex. D at 8. In September 2003, Union Pacific hired Burgener as a trainman and assigned to him a seniority date of September 27, 2003. *Id.* at 15-16; Burgener Decl. ¶ 2. The seniority date determines whether an employee has the right to take certain job assignments and whether an employee may "bump" a more junior employee from a job assignment.[2] Burgener Decl. ¶ 2. In April 2004, Burgener was called to active duty, which required him to take a leave of absence from Union Pacific. *Id.* ¶ 4; Quinn Decl. Ex. D at 19. Burgener returned to Union Pacific on April 29, 2005 and was reinstated as a trainman. *See* Burgener Decl. ¶ 5.

On May 9, 2005, Burgener asked to be enrolled in a locomotive engineer training course. Quinn Decl. Ex. D at 31; Burgener Decl. ¶ 5. The course in question was scheduled to begin on May 15, 2005, six days after Burgener notified Union Pacific of his desire to take the class. Davis Decl. ¶ 4; Burgener Decl. ¶ 5. The request for enrollment was denied on the ground that the enrollment bidding period had closed. Burgener Decl. ¶ 5; Davis Decl. ¶¶ 4-7. Union Pacific also represents that the class was full at the time of Burgener's request and there was insufficient time to make alternate arrangements—such as travel accommodations and shift coverage—for Burgener to attend. Davis Decl. ¶¶ 4-6. It is undisputed that had Burgener not been away on active duty, he would have been eligible to enroll in the May 2005 class during the enrollment bidding period. Burgener Decl. ¶¶ 4-5.

In June 2005, Union Pacific posted a bulletin for an engineer training course that was scheduled to begin in August 2005. Burgener Decl. ¶ 6. Burgener bid on that class and was accepted. *Id.*; Davis Decl. ¶ 8. According to Burgener, however, Union Pacific failed to provide him with follow-up information as to when the course was to begin. Burgener Decl. ¶ 6. As time passed, Burgener became concerned that he was being discriminated against because of his

---

[2] According to Union Pacific, seniority largely determines promotion rights but non-seniority criteria also is considered, including an employee's record of discipline, attendance, and compliance with safety rules. *See* Degraw Decl. ¶¶ 3-6.

military status. *Id.* ¶ 7. Burgener eventually filed a complaint with the U.S. Department of Labor–Veteran's Employment Training Service ("DOL-VETS") in late January 2006. *Id.* DOL-VETS opened a file with respect to Burgener's complaint on February 1, 2006. *Id.* Union Pacific maintains that the engineer class was delayed because of manpower issues and the need to rearrange assignments while certain employees attended the training. Degraw Decl. ¶ 8. In other words, there was no engineer training class for Burgener to attend until Union Pacific could alleviate these logistical issues. *See id.* The next engineer class eventually began in February 2006. *Id.*; Burgener Decl. ¶ 8.

After the training course began, Burgener's pay scale was elevated to that of a fireman, which is a level greater than trainman's scale but less than that of a licensed engineer. Burgener Decl. ¶ 8. Burgener completed the first three weeks of engine training on March 3, 2006, which in accordance with Union Pacific's standard procedure also was Burgener's seniority date for engine service until he received his engineer's license. *See id.* ¶ 11. However, DOL-VETS advised Burgener that because he could have enrolled in a class during 2004 had he not been posted on active duty, he should be given an earlier priority date corresponding to the seniority date he otherwise would have received, which in this case was July 30, 2004. *Id.* ¶¶ 10, 12. According to Burgener and DOL-VETS, the July 30, 2004 seniority date should have been implemented on or shortly after September 26, 2006, when Burgener received his engineer's license.[3] *See id.* ¶ 13. DOL-VETS also advised Burgener that he was entitled to the difference in wages he otherwise would have earned had he been working as an engineer with a seniority date of July 30, 2004. *See id.* ¶ 13. Union Pacific was aware that Burgener had contacted DOL-VETS and had been informed of the opinion of DOL-VETS with respect to Burgener's seniority date and past wages. *Id.* DOL-VETS referred Burgener's case to the U.S. Attorney General on July 10, 2007. *See id.* ¶ 18.

When Burgener requested an adjustment to his priority date upon his promotion to engineer in September 2006, he was informed by Union Pacific that such an adjustment would

---

[3] The parties agree that Burgener had to complete the engineer training course before requesting a revision to his seniority status.

have to be processed through his union in accordance with the collective bargaining agreement ("CBA") between the union and the company.[4] *See* Burgener Decl. ¶ 16; Hallberg Decl. ¶ 9. All train, engine and yard service employees at Union Pacific are required to be members of the union, and Burgener had never joined any of the available labor organizations. *See* Quinn Decl. Ex. 1 at 51-52; Hallberg Decl. ¶ 8. In addition, any disputes regarding an employee's seniority must be presented to Union Pacific through the employee's union representative. Hallberg Decl. ¶ 3; Quinn Decl. Ex. 2 at 25. Prior to his promotion to engineer, Burgener mistakenly had believed that he already was a member of a union because certain deductions were being withheld from his paycheck. Quinn Decl. Ex. 1 at 52. However, these deductions in fact were for health and welfare benefits, not union dues. *Id.* In December 2006, Burgener contacted the union and was informed that he had to pay membership dues for the prior ten months before he could become a member in good standing. *See id.* Ex. 2 at 17-18. By March 2007, Burgener had become a member in good standing of the union. *Id.* at 19.

On March 26, 2007, a local union representative contacted the union chairman, Bill Hannah ("Hannah"), regarding Burgener's request for a seniority adjustment. Quinn Decl. Ex. 2 at 13-14, 18-19. Hannah is the union's ultimate decision maker with respect to a request by an employee for a revised seniority date. *Id.* at 6. Once Hannah received Burgener's request for a revised seniority date, he undertook an investigation to determine the proper seniority date, which involved a review and analysis of Burgener's military records, past bulletins for engineer training courses, and the seniority status of other engineers. *Id.* at 19-22, 33. *See also* Hallberg Decl. ¶ 7. After five months of review, Hannah presented his findings to Union Pacific management.[5] In a letter dated August 7, 2007, Hannah recommended that Burgener be given a

---

[4] According to Union Pacific's Director of Labor Relations, Burgener was informed of the union membership requirement before he completed the engineer training course. Hallberg Decl. ¶ 10.

[5] According to Hannah, the fact that it took five months to process Burgener's request was not unusual, because a revision to the seniority list requires "meticulous" documentation support the request since any employees affected by the revision may protest the decision. *See* Quinn Decl. Ex. 2 at 47. *See also* Hallberg Decl. ¶ 5. In addition, Union Pacific normally

seniority position just behind another employee, Engineer Esquibel. Hallberg Decl. Ex. 3. Union Pacific agreed with Hannah's proposed revision, but it adjusted Burgener's priority date to August 20, 2004, which was the priority date for Engineer Esquibel. *See* Degraw Decl. ¶ 10. According to Union Pacific, the order of seniority on the engineer roster, rather than the date, is the determinative factor for seniority purposes. *Id*. *See also* Quinn Decl. Ex. 2 at 39 (during his deposition, Hannah corroborated the primacy of the sequence of seniority). On August 16, 2007, Union Pacific adjusted Burgener's seniority status to August 20, 2004. Degraw Decl. ¶ 12. Burgener maintains that his seniority date should be July 30, 2004, based on the respective roster positions of other engineers that were trained in the course in which Burgener otherwise would have been enrolled. *See* Burgener Decl. ¶ 18.

A. Union Pacific's Training Program and Discipline Policy

Union Pacific employs a training program called the Field Training Exercise ("FTX") program. Hill Decl. ¶ 1. The FTX program is designed to test employee compliance with Union Pacific's rules, regulations and instructions. *Id*. ¶ 2. FTX exercises involve both routine observation and structured testing scenarios. *Id*. During 2007, if an employee was observed violating a rule, that employee either received remedial coaching under the FTX program or was subjected to disciplinary action under Union Pacific's Discipline Policy, depending on the employee's eligibility to participate in FTX program and the seriousness of the rule violation. *Id*. ¶ 3. Employee eligibility for remedial coaching is determined by his or her "EQMS score." *Id*. Every Union Pacific employee starts with the same baseline EQMS score and points are deducted for rule violations. *Id*. Alternatively, points may be earned to offset deductions. *Id*. Employees with an EQMS score of less than 900 are not eligible for FTX coaching, and any rule violations committed during a subsequent FTX exercise instead are processed pursuant to the company's Discipline Policy. *Id*. ¶ 4. In addition, certain rule violations are not eligible for remediation by coaching under the FTX program and automatically are handled under the Discipline Policy. *Id*.

---

requires that any seniority appeal be filed within sixty days of the posting of the seniority roster. Hallberg Decl. ¶ 6. Union Pacific processed the request even though Burgener's appeal was presented ten months after the posting of the seniority roster. *Id*.

Such rule violations include Federal Railroad Administration ("FRA") decertifiable events and cardinal rule violations. *Id*. Committing an FRA decertifiable event will result in revocation of an engineer's license to operate a locomotive. *See id.* ¶ 7.

B. August 2007 XG Order Violation

On August 13, 2007, a Union Pacific Manager of Operating Practices, David Slater ("MOP Slater"), administered an FTX exercise with the assistance of another manager. Quinn Decl. Ex. F at 45, 49. During the exercise, a Union Pacific train dispatcher conveyed a mandatory directive crossing protection order (an "XG" order) to Burgener and his crew. Quinn Decl. Ex. F at 45,49-52. An XG order requires that a train crew bring the train to a complete stop prior to entering a railroad crossing, pursuant to Rule 6.32.2 of Union Pacific's General Code of Operating Rules. *See* Aylward Decl. ¶¶ 2, 8 & Exs. 1-2. According to Union Pacific, each crew member must understand a mandatory directive from a dispatcher and is individually responsible for looking up the rule or calling the dispatcher or a manager if there is any confusion regarding the correct procedure. Quinn Decl. Ex. F at 66.

Prior to entering the crossing, Burgener requested that the conductor determine the proper procedure for an XG order by referencing a Union Pacific rule book. Quinn Decl. Ex. D at 91. The conductor mistakenly relayed the instructions for an XH procedure, which required merely that the train slow down before the crossing and then proceed if the warning devices at the crossing were functioning properly. Burgener Decl. ¶ 23. In addition, at the time it was Burgener's recollection that an XG order required that the train slow down before entering a track crossing, rather than come to a complete stop. *Id*. ¶ 21; Quinn Decl. Ex. D at 90. Thus instead of bringing the train to a complete stop, Burgener and his crew slowed down before the railroad crossing. Burgener Decl. ¶ 22. When it appeared that the automatic gates and lights were functioning, Burgener proceeded through the crossing at five miles per hour, in accordance with the XH procedure. *Id*. at ¶¶ 22-23.

Almost immediately after the rule violation, Burgener received an order directing him to stop the train. Burgener Decl. ¶ 23. MOP Slater and the other manager boarded the train and debriefed the crew regarding the violation. *Id*. ¶¶ 23-24. A formal disciplinary hearing was held

on September 12, 2007, at which Burgener and the other crew members were charged with a violation of Rule 6.32.2. Aylward Decl. ¶¶ 2-3. The hearing was presided over by a Union Pacific hearing officer, and Burgener had union representation. *Id*. ¶¶ 3-4. MOP Slater testified at the hearing, as did the other manager who participated in the exercise. *Id*. ¶ 5. The hearing officer concluded that Burgener and his crew had violated Rule 6.32.2, which under Union Pacific's then-current Discipline Policy constituted a Level 4 violation. *Id*. ¶¶ 8-10. In addition, violation of an XG order also involved the occupation of the "main track or segment of track without proper authority or permission" in violation of 49 C.F.R. § 240.117(e)(4). Hill Decl. ¶ 7. Burgener was assessed a Level 4 violation and his engineer's license was suspended for thirty days. Aylward Decl. ¶ 10. This disciplinary assessment also meant that Burgener no longer was eligible for coaching under the FTX program until his EQMS score was raised back to 900. Hill Decl. ¶ 8.

Burgener does not dispute that he violated an XG order. *See* Burgener Decl. ¶ 25. However, he objects strenuously to Union Pacific's treatment of the violation as a FRA decertifiable event and Level 4 violation rather than a teaching event under the FTX program. *See id.* at ¶¶ 25-26. Specifically, Burgener contends that Union Pacific has not presented any documentation that the XG order violation constituted an occupation of the main track without authority. *Id.* ¶ 25. The assessment of a Level 4 violation in conjunction with a decertifiable event meant that Burgener was no longer eligible for remedial coaching under the FTX program and that a subsequent Level 4 violation could result in termination from Union Pacific. *Id.* ¶ 26; Hill Decl. ¶ 9. Burgener also asserts that MOP Slater had an improper motive to assess a Level 4 violation against Burgener because the proper adjustment of Burgener's seniority would have allowed Burgener to bump Slater from job assignments. *See* Burgener Decl. ¶ 23. Burgener also alleges that the timing of the FTX exercise and subsequent disciplinary hearing was highly suspicious in light of Burgener's pending complaint with DOL-VETS, and the July 2007 notification by DOL-VETS that it was referring Burgener's case to the Attorney General. *Id.* ¶ 18.

In response, Union Pacific asserts that during the time in question an XG order violation

always was treated as a Level 4 violation and an FRA decertifiable event. *See* Hill Decl. ¶ 7; Quinn Decl. Ex. F at 75-76, 113-14. Specifically, the unauthorized occupation was the presence of the train on the section of track between the crossing gates. Quinn Decl. Ex. F at 76. In addition, the applicable rules policy states in writing that a "Rule 6.32.2 Automatic Warning Devices (Resulting in FRA Decertification Event)" is a Level 4 violation. Egusquiza Decl. Ex. 6 at 9. Union Pacific thus asserts that it was required to decertify Burgener and suspend his engineer's license for thirty days. *See* Hill Decl. ¶ 7; Aylward Decl. ¶ 10.

C. September 2007 Level 2 Violation

After the disciplinary hearing on the XG order violation, Burgener served his suspension and was reinstated on a remedial assignment system. Quinn Decl. Ex. D at 103. Shortly after he completed his remedial training, Burgener was charged with another rule violation. *Id*. at 106-107. On September 22, 2007, Burgener's train struck a vehicle at a crossing. *See id.* at 107. Burgener and his crew were charged with failing to have a proper job briefing. *Id.* at 107-08. For this incident, Burgener signed a waiver of discipline and was assessed with a Level 2 violation. *Id*. at 106, 108. At his deposition, Burgener testified that he signed the waiver acknowledging responsibility for the incident because a job briefing violation could be assessed as a Level 4 violation, which in conjunction with the August 2007 incident could result in a Level 5 assessment and termination. *See id.* at 108-09. Burgener's union representative had recommended that Burgener sign the waiver before Union Pacific realized that it had made a mistake. *Id*.

D. November 2007 Discipline Charges and Termination

On November 2, 2007, Burgener was involved in a third incident. Quinn Decl. Ex. F at 87. During the early morning, Burgener and his crew were "swapping ends" of a train, which involves changing the locomotive that is pulling the train. Burgener Decl. ¶ 29. MOP Slater and another Union Pacific manager were present in the train yard during this time, performing observation tests on various train crews. Quinn Ex. F at 88. The managers observed Burgener and his crew perform the swapping procedure correctly on at least several occasions. Burgener Decl. ¶ 29; Quinn Decl. Ex. F at 87. However, as a result of complaints by one of his crewmen,

Burgener omitted certain required steps for the swapping procedure. Burgener Decl. ¶ 29; Quinn Decl. Ex. D at 117-19. Union Pacific's rules require that before the locomotives are cut loose from the railcars, a sufficient number of handbrakes must be set on the railcars to prevent undesired movement and a securement test must be performed by releasing all of the air to see if the cars move, which helps determine whether additional handbrakes should be set. Egusquiza Decl. ¶ 6 & Exs. 1-2; Quinn Decl. Ex. F at 94-96. MOP Slater charged Burgener and his crew with failing to set the correct number of handbrakes and failing to perform a securement test. Quinn Decl. Ex. F at 94, 98-99, 106-107. According to Union Pacific, Burgener was not FTX eligible for this incident because of his prior Level 4 assessment for the XG order violation. Hill Decl. ¶ 9; Burgener Decl. ¶ 29.[6]

A formal disciplinary hearing was held on November 14, 2007. Burgener again was represented by the union and testified on his own behalf. Egusquiza Decl. ¶ 4. At the hearing, Burgener admitted that he had committed the alleged infractions. *Id.* ¶ 6 & Ex. 4 at 83, 94; Quinn Decl. Ex. D at 111-12. The hearing officer concluded that the alleged rule violations had been committed and recommended the charges be sustained. Since the charges were upheld, Burgener was assessed a Level 5 violation in accordance with the Discipline Policy. *See* Egusquiza Decl. ¶ 11. Under the Discipline Policy, if an employee receives two Level 4 violations in a twenty-three month period, the required discipline assessment is a Level 5 violation, resulting in permanent dismissal. *Id.* & Ex. 6. On November 21, 2007, Union Pacific notified Burgener in writing of his termination. Second Amended Complaint ("SAC") ¶ 31.

E. The Instant Action

Burgener filed the instant action on October 9, 2007, before he committed the second Level 4 violation and before his termination from Union Pacific.[7] On February 11, 2008, Burgener filed the operative SAC, asserting two claims against Union Pacific under USERRA.

---

[6] The other crew members were FTX eligible because they did not have a preexisting Level 4 assessment and thus were not subject to the Discipline Policy. *See* Burgener Decl. ¶ 29.

[7] Burgener initially proceeded *pro se* but since has retained legal counsel.

The first claim alleges that Union Pacific committed multiple discriminatory acts in violation 38 U.S.C. § 4311(a). SAC ¶¶ 8-24. Because of the incorrect seniority date, Burgener alleges that he was unable to secure preferred job assignments. *Id.* ¶ 21. The second claim alleges that Union Pacific retaliated against Burgener for exercising his rights under USERRA, in violation of 38 U.S.C. § 4311(b).[8] *Id.* ¶¶ 26-35. Burgener seeks lost wages, liquidated damages, and reinstatement as a Union Pacific engineer. *Id.* at 6.

**II. LEGAL STANDARD**

Summary judgment should be granted only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the Court of the basis for the motion and identifying the portions of the pleadings, depositions, or other evidence that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. *See also Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) ("a moving party without the ultimate burden of persuasion at trial does not carry its initial burden of production if it fails to produce affirmative evidence negating an essential element of the nonmoving party's claim or defense."). A genuine issue for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Anderson*, 477 U.S. at 248-49; *Dark v. Curry County*, 451 F.3d 1078, 1082 (9th Cir. 2006) ("the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial."). Determining credibility, the weighing of evidence, and drawing conclusions from the facts are functions of the jury, not the judge, and should be reserved for trial. *See Anderson*, 477 U.S. at

---

[8] Burgener also has filed grievances through the union with respect to both the September 2007 and November 2007 disciplinary assessments. Both grievances are pending. Quinn Ex. D. at 129.

255.

## III. DISCUSSION

A. Discrimination in Violation of USERRA

Pursuant to 38 U.S.C. § 4311(a), a uniformed service member "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer" on the basis of that member's military service. An employer violates USERRA if the employee's affiliation with the military "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership." 38 U.S.C. § 4311(c)(1).[9] Military status need not be the sole cause of an adverse action; rather, it only must be "one of the factors that 'a truthful employer would list if asked for the reasons for its decision.'" *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005) (quoting *Brandsasse v. City of Suffolk, Va.*, 72 F. Supp. 2d 608, 617 (E.D. Va. 1999)). *See also Fink v. City of New York*, 129 F. Supp. 2d 511, 520 (E.D.N.Y. 2001) ("Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration.") (citation omitted).

A plaintiff asserting a claim for discrimination under USERRA bears the initial burden of showing by a preponderance of the evidence that his military service was "a substantial or motivating factor" in the adverse employment action. *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001) (citing *Nat'l Labor Relations Bd. v. Transp. Mgmt. Corp.*, 462 U.S. 393, 400-01 (1983) ("*NLRB*")). Once the plaintiff meets this initial burden, the employer must show, by a preponderance of the evidence, that the adverse action would have occurred for valid reasons, regardless of military status. *See id.* at 1013-14. Whether an employer had the requisite discriminatory motive or intent is a factual question that may be proved either by direct or

[9] The discriminatory motive requirement sets § 4311 apart from § 4312, which requires an employer to rehire an employee forced to take a leave of absence due to military service, and when rehired the employee must be reinstated at the position he would have had otherwise been qualified to perform. *See Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 306 (4th Cir. 2006) (citing 38 U.S.C. § 4313(a)(2)(A), which defines the rights provided for by § 4312)). Burgener has not pled a claim for relief under § 4312.

circumstantial evidence. *Id*. at 1014. Discriminatory motive often may be found only through an inference supported by circumstantial evidence, including "proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." *Id*.

Burgener contends that Union Pacific violated § 4311(a) by not allowing him to enroll immediately in the May 2005 class and then failing to adjust his seniority date properly and in a timely fashion. In addition, Burgener claims that Union Pacific discriminated against him by not paying him back wages based upon the seniority date he would have achieved had he not been deployed.[10]

1. Denial of May 2005 Enrollment Request

Burgener asserts that Union Pacific's decision to deny his request for enrollment in the May 15, 2005 engineer training class was motivated by his former military service. In support of this allegation, Burgener presents no evidence other than the fact that he would have been able to enroll had he been employed at Union Pacific during the open bidding period and an argument that Union Pacific could have made space for him in the training class.[11] In response, Union

---

[10] As discussed in further detail *infra* at note 14, Burgener may have a claim for back pay under § 4316(a), irrespective of whether Union Pacific had any discriminatory motive. The SAC does not state a claim for relief under § 4316(a), but Burgener's motion for summary judgment argues that back pay is owed under § 4311(a) because of the requirements of § 4316(a). Union Pacific's opposition to the motion appears to treat Burgener's claim as being based only on § 4311(a), as no mention is made of § 4316(a) in the opposition brief. For purposes of the instant motion, the Court will treat Burgener's claim as a request for relief under § 4311(a) only.

[11] Burgener has not presented any evidence that Union Pacific was displeased with his absence or that his absence had been a burden for the company, which may support an inference of motive. *See Leisek v. Brightwood Corp*., 278 F.3d 895, 900 (9th Cir. 2002) (record contained evidence that service member's absences had burdened the employer); *Velazquez-Garcia v. Horizon Lines Of Puerto Rico, Inc.*, 473 F.3d 11, 17-18 (1st Cir. 2007) (evidence included anti-military statements); *Reed v. Honeywell Intern., Inc.*, No. CV 07-0396, 2009 WL 886844, at *7 (D. Ariz. Mar. 31, 2009) ("The lack of employer complaints before the request for leave, and the

Pacific has shown that Burgener submitted his request a mere six days before the class was scheduled to begin. Moreover, it is Union Pacific's standard policy to schedule the enrollment period months before the actual class because travel arrangements have to be made for the trainees, many of whom are based far from the training location site. Federal regulations also require that Union Pacific conduct certain background testing and evaluation on prospective trainees to ensure that they are in fact eligible to become engineers. *See* 49 C.F.R. § 240.101. Finally, Burgener was accepted into the next class shortly thereafter during the next open enrollment period in June 2005.

Burgener nonetheless argues that Union Pacific's unwillingness to accommodate him immediately after his initial request constitutes sufficient circumstantial evidence of a discriminatory motive because Union Pacific was required by law to honor Burgener's request. However, such a position is not supported by the applicable DOL regulations, which state:

> As a general rule, the employee is entitled to reemployment in the job position that he or she would have attained with reasonable certainty if not for the absence due to uniformed service. This position is known as the escalator position. The principle behind the escalator position is that, if not for the period of uniformed service, the employee could have been promoted (or, alternatively, demoted, transferred, or laid off) due to intervening events. The escalator principle requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service. *Depending upon the specific circumstances*, the employer may have the option, or be required, to reemploy the employee in a position other than the escalator position.

20 C.F.R. § 1002.191 (emphasis added). In addition, "the employer may have to consider several factors before determining the appropriate reemployment position in any particular case. Such factors may include the employee's length of service, qualifications, and disability, if any." 20 C.F.R. § 1002.192. An employer must make "reasonable efforts" to aid the returning employee in becoming qualified to perform the desired escalator position. *See* 20 C.F.R. §§ 1002.197-198.

---

fact that her supervisor was apparently angered by the request and the resulting absence are facts that support the conclusion that military service was a motivating factor in the subsequent complaints and counseling.").

Although Burgener argues that the record conclusively supports his allegation that it was patently unreasonable for Union Pacific to deny his initial enrollment request, Union Pacific has presented substantial evidence that its efforts in fact were reasonable under the circumstances. Viewing the evidence in the light most favorable to the nonmoving party, *Dark*, 451 F.3d at 1082 n.2, the Court concludes that at the very least there is a question of fact with respect to the reasonableness of Union Pacific's actions during May 2005.[12]

2. Delay of August 2005 Training

Burgener also contends that Union Pacific violated § 4311(a) when it delayed the August 2005 training until February 2006. Union Pacific allegedly gave Burgener no explanation for the delay, which prompted Burgener to investigate his employment rights under USERRA. Burgener subsequently filed a complaint in January 2006 with DOL-VETS, which then notified Union Pacific's Equal Employment Opportunity ("EEO") Department of a potential USERRA violation. The delayed training began shortly thereafter in February 2006.

In rebuttal, Union Pacific has presented evidence that the delay in training was caused by a manpower shortage. In particular, Union Pacific recently had promoted a number of trainmen to engineer after the May 2005 class, and thus the trainmen ranks had to be replenished before a new group was selected for training and promotion to engineer. For purposes of the instant motion, Burgener has failed to show as a matter of law that the delay in training was motivated by his protected status. No other classes were held, and similarly situated trainmen who were enrolled in the August 2005 class presumably were disadvantaged to the same extent. Moreover, while it is unclear whether Burgener's DOL-VETS complaint prompted Union Pacific to hold the training, the evidence reasonably could be interpreted as demonstrating that Union Pacific was trying to accommodate Burgener's concerns by arranging a training soon after it became aware of the potential USERRA violation.

3. Adjustment of Seniority Date

Burgener also asserts that Union Pacific was obligated to adjust his seniority date

[12] Union Pacific does not seek summary judgment on Burgener's discrimination claim.

promptly, irrespective of the CBA between the company and his union. Burgener is correct that the CBA cannot be used as a shield to withhold rights owed to him. *See Lang v. Great Falls Sch. Dist. No. 1 and A*, 842 F.2d 1046, 1050 (9th Cir. 1988) ("Employment practices or agreements between employers and unions cannot reduce the benefits which Congress has secured for veterans."). However, Union Pacific has presented substantial rebuttal evidence that any delay in assigning the correct priority date—and the parties dispute the exact date that should be credited—did not arise out of or relate to Burgener's protected status. As a Union Pacific employee stationed in the train yard, Burgener was required to be a member of the union, but he had failed to join. The CBA required that any complaints regarding seniority be brought to the attention of union, which then would negotiate with Union Pacific on the employee's behalf. Burgener did not contact a union representative until December 2006. After Burgener became a member of the union in good standing in March 2007, the union analyzed his request over the course of five months before presenting its recommendation to Union Pacific on August 7, 2007. Union Pacific adopted the union's recommendation on August 16, 2007.

While it is conceivable Union Pacific attempted to delay the adjustment of Burgener's priority date, or that it adopted an incorrect priority date at least partly because of Burgener's military status, such a hypothetical argument is insufficient for Burgener to prevail on summary judgment. A reasonable jury could find in the alternative that it was proper for Union Pacific to wait until the conclusion of the engineer training to adjust Burgener's seniority, and that any subsequent delay in the adjustment arose from circumstances beyond Union Pacific's control. Moreover, while Union Pacific in fact may have been required to adjust Burgener's seniority date irrespective of its obligations under the CBA, a mistaken interpretation of USERRA's statutory scheme does not establish discriminatory motive as a matter of law. *See Velazquez-Garcia*, 473 F.3d at 21 n.9 (noting that USERRA is concerned with discrimination rather than incorrect application of law).[13]

---

[13] In addition, the applicable regulation with respect to an employer's adjustment of an employee's seniority, status and rate of pay includes "those established (or changed) by a collective bargaining agreement, employer policy, or employment practice. The sources of

4. Failure to Provide Back Pay

"In a civil action brought pursuant to USERRA, a 'court may require the employer to compensate the person for any loss of wages or benefits suffered by reason of such employer's failure to comply with the provisions of [USERRA].'" *Serricchio v. Wachovia Secs., LLC*, No. 3:05-cv-1761, 2009 WL 724043, at *1 (D. Conn. Mar. 19, 2009) (quoting 38 U.S.C. § 4323(d)(1)(B)). In the instant action, Burgener seeks, *inter alia*, compensation for "loss of wages and benefits pursuant to § 4323(d)(i)(B) [sic]…" SAC at 6. The operative pleading alleges that Union Pacific violated § 4311(a) and/or § 4311(b) of USERRA. Both of these subsections require that a plaintiff establish that his military status was a "motivating factor" in the adverse employment decision. 38 U.S.C. § 4311(c).

It is undisputed that DOL-VETS provided notification to Union Pacific that Burgener may be entitled to back pay under USERRA. *See* Herrick Decl. Ex. I. While Union Pacific's inaction in light of such notice may be probative of a discriminatory motive, such an inference is insufficient for Burgener to prevail on this issue at the summary judgment stage.[14] As discussed

---

seniority rights, status, and pay include agreements, policies, and practices in effect at the beginning of the employee's service, and any changes that may have occurred during the period of service." 20 C.F.R. § 1002.193.

[14] As noted previously, Burgener may have a claim for back pay even if Union Pacific acted without discriminatory motive. The letter from DOL-VETS states that Burgener's promotion "must be made effective as of the date it would have occurred had employment not been interrupted by military service (20 C.F.R. 1002.193(b))." Herrick Decl. Ex. I. The letter then states that Burgener is "entitled to the pay differential when you complete the course, and the pay needs to be back-dated to the date you would have started drawing the Journeyman Engineer pay but for your military service." *Id.* However, the DOL-VETS letter does not cite any regulation in support of the assertion regarding the back pay owed to Burgener. DOL-VETS may have made this statement based on the language of 20 C.F.R. § 1002.236(a), which states that "if the employee missed a merit pay increase while performing service, but qualified for previous merit pay increases, then the rate of pay should include the merit pay increase that was missed." This regulation also states that "[a]s with the escalator position, the rate of pay must be determined by taking into account any pay increases, differentials, step increases, merit increases, or periodic increases that the employee would have attained with reasonable certainty had he or she remained continuously employed during the period of service." 20 C.F.R. § 1002.236(b). In addition, a separate USERRA provision, 38 U.S.C. § 4316(a), states that "[a] person who is reemployed under this chapter is entitled to the seniority and other rights and benefits determined by seniority that the person had on the date of the commencement of service in the uniformed

above, Union Pacific may have misinterpreted its obligations under USERRA, but such an error by itself is insufficient to establish discriminatory motive. Accordingly, Burgener's motion for summary judgment will be denied.[15]

B. Retaliation in Violation of USERRA

USERRA also "prohibits employers from taking 'any adverse employment action against any person because such person…(4) has exercised a right provided for in this chapter.'" *Wallace v. City of San Diego*, 479 F.3d 616, 624-25 (9th Cir. 2007) (quoting 38 U.S.C. § 4311(b)). In evaluating a claim for retaliation, the Court first must determine whether the employee exercised his rights under USERRA. *Id.* at 624. Once this threshold determination is made, the burden-shifting framework set forth in *NLRB* is applied. *Id.* Ultimately, an employer "[must] demonstrate, by a preponderance of the evidence, that it would indeed have fired [the employee], regardless of his military status." *Velazquez-Garcia*, 473 F.3d at 20. *See also Woodard v. N.Y. Health and Hosps. Corp.*, 544 F. Supp. 2d 329, 348 (E.D.N.Y. 2008).

It is undisputed that approximately one month before his termination, Burgener filed a *pro se* complaint in this Court alleging discrimination in violation of USERRA. In addition, Burgener also had filed a complaint with DOL-VETS, which subsequently informed Union Pacific in July 2007 that it was referring the matter to the Attorney General. Thus, for purposes

services plus the additional seniority and rights and benefits that such person would have attained if the person had remained continuously employed." A claim under § 4316(a) may not require a showing of discriminatory motive. *See Anderson v. Sanford L.P.*, No. 3:06-CV-466, 2008 WL 351227, at * 7 (E.D. Tenn. Feb. 7, 2008) ("To succeed on a claim under § 4316(a) based upon a defendant's failure to give plaintiff a raise, a plaintiff must establish that he did not receive that raise that he would have been reasonably certain to receive had he not been absent due to military service.").

[15] Because the Court finds that Burgener has not established as a matter of law that Union Pacific violated § 4311(a), the determination as to whether any alleged discrimination was willful pursuant to § 4323 (d)(1)(C) will be deferred until trial. In addition, and depending on the outcome at trial, Burgener may be entitled to additional compensation if he can show that the alleged discrimination resulted in reduced pay due to unfavorable shift assignments. *See Smith v. U.S. Postal Serv.*, 540 F.3d 1364, 1367 (Fed. Cir. 2008) ("The applicable regulations…define 'status' for USERRA purposes to include 'shift assignment,' indicating that a favorable shift assignment is a benefit, and section 4324(c)(2) of USERRA directs that loss of benefits must be compensated.").

of the instant motion, Burgener has stated a cognizable claim for retaliation. *See Wallace*, 479 F.3d at 624. However, the dispositive inquiry is whether Burgener's protected status played a role in Union Pacific's decision to discipline and ultimately terminate him.

To meet his initial burden of showing that Union Pacific's termination decision was motivated by his military status, Burgener has presented circumstantial evidence of (1) temporal proximity of his complaint to the adverse employment action; (2) a motive for at least one Union Pacific employee, MOP Slater, to terminate Burgener to avoid displacement on the seniority list once Burgener's seniority status was revised; and (3) the Union Pacific's incorrect application of its disciplinary rules. There is no question that there is a close temporal relationship between the timing of Burgener's complaints and his discipline and subsequent termination. However, Union Pacific argues that the proximity is coincidental. In support of its contention that the timing of the termination was independent of Burgener's USERRA complaints, Union Pacific has presented evidence that MOP Slater did not single out Burgener for disciplinary infractions. Union Pacific also has submitted declarations by both of the hearing officers who presided over the disciplinary proceedings that ultimately led to Burgener's termination. Both of the hearing officers state that they assessed the correct penalties against Burgener. In addition, Union Pacific emphasizes that there is no dispute that Burgener violated significant safety rules, and that the parties' primary disagreement centers primarily on whether the August 2007 infraction was in fact a Level 4 violation and an FRA decertifiable event.

Burgener admits that he did not follow the proper procedure for an XG order. *See* Burgener Decl. ¶ 23. Nonetheless, he argues that Union Pacific is not entitled to summary judgment because there is no definitive evidence that a violation of an XG order constitutes occupation of a main track without authority. *See id.* ¶ 25 ("To this day, no one has shown me any document that states that a violation of XG procedure constitutes occupying the main track without authority."). Burgener asserts further that the lack of a unequivocal written policy coupled with the inconsistent deposition testimony of MOP Slater as to whether the infraction was sufficiently serious to require suspension under Union Pacific's Discipline Policy supports an inference that would allow a reasonable jury to find that Union Pacific retaliated against him.

The evidence in the record provides considerable clarity with respect to this issue. Union Pacific's Discipline Policy states that a Rule 6.32.2 violation "Resulting in FRA Decertification Event" is a Level 4 violation. Egusquiza Decl. Ex. 6 at 9. It is true that the policy does not state explicitly that a Rule 6.32.2 violation is an FRA decertifiable event because it involves the occupation of the main track without authority. *See id.* Nor does the hearing officer state that there was an unauthorized occupation of the main track; rather, he states that "the required discipline for violation of Rule 6.32.2 is a Level 4. The required discipline assessment for a Level 4 violation under the UPGRADE Discipline Policy was a 30 day suspension." Aylward Decl. ¶ 9. Moreover, while the declaration by a Union Pacific Director of Safety states that an XG order violation was an FRA decertifiable event because of occupation of the main track without authority, no written policy is submitted in support of this statement other than a reference to the Code of Federal Regulations. *See* Hill Decl. ¶ 7. Viewing the evidence in the light most favorable to Burgener, it would appear that Union Pacific has not presented conclusive proof that Burgener occupied the main track without authority by failing to comply with the XG order.

However, this sliver of ambiguity does not defeat Union Pacific's motion for summary judgment. Burgener states that Union Pacific changed its policy with respect to XG order violations several months after his termination, changing the penalty from a Discipline Policy event to an FTX coaching event. Burgener Decl. ¶ 26. While this statement presumably was submitted to show that Union Pacific's treatment of his XG order violation was overly harsh and that Union Pacific could have addressed Burgener's actions under the FTX program, it also demonstrates that Union Pacific did not apply the Discipline Policy inconsistently during Burgener's disciplinary hearing. Instead, it would appear that it was Union Pacific's standard policy at that time to treat an XG order violation as a Discipline Policy event. This fact is supported by the deposition of union chairman Hannah, which states that:

> [P]rior to May 1st, 2008, [Union Pacific] identified XG crossing failures as a decertifiable event. Specifically entering main track without authority, which the [union] disagreed with. And [Union Pacific's] position was that it was a level four decertified event or maybe a level four CD certified event, which means that they

> would take the engineers [sic] licensing. That after May 1st, 2008 is no longer the case.

Herrick Decl. Ex. O at 92. While Hannah may have disagreed with the company's treatment of XG order violations, the record contains absolutely no evidence that Union Pacific disciplined Burgener in a way that varied from the standard disciplinary rules it had in place during 2007.[16] Accordingly, there is no evidence that Union Pacific had a discriminatory motive in treating the August 2007 event as a Level 4 violation and FRA decertifiable event. Indeed, it was the standard policy of the company at that time to treat an XG order violation as a Level 4 incident.

Burgener's claim for retaliatory termination depends upon a showing that Union Pacific's treatment of the August 2007 incident was based at least in part upon a discriminatory motive. *See* 38 U.S.C. § 4311(b)-(c); Burgener Decl. ¶ 29 ("Had it not been for the fact that Union Pacific treated the violation of the XG order as a disciplinary event…I would not have been in a position to be terminated as a result of the [November 2007] violation."). Accordingly, Union Pacific has met its burden of showing that Burgener's termination would have occurred despite any animosity or discriminatory motive.

Burgener's characterization of the role of MOP Slater is similarly unavailing. MOP Slater testified in his deposition that he was unaware of the identity of the crew on the train subject to the training exercise. *See* Quinn Decl. Ex. F at 50. He also testified that he was conducting routine observation on the night of Burgener's final infraction. *Id*. at 88. Burgener takes issue with these statements and asserts that Slater was targeting him intentionally. But even assuming that Burgener's suspicions with respect to Slater's motive are true, there is evidence other than Burgener's subjective belief that Slater was acting in response to Burgener's complaints regarding his USERRA status. Moreover, even if Burgener's military status was a motivating factor for Slater, the fact that the discipline assessed against Burgener came after a disciplinary hearing before a neutral hearing officer limits the relevance of any improper motive.

---

[16] Hannah also described Union Pacific's treatment of an XG order violation as an occupation of the main track without authority as "ludicrous," but he made this characterization in reference to how the rule was applied to all employees generally, rather than Burgener specifically. *See* Herrick Decl. Ex. O at 95 ("Granted, I don't know this particular case…").

*See Staub v. Proctor Hosp.*, Nos. 08-1316, 08-2255, 08-2402, 2009 WL 764157, at *5 (7th Cir. Mar. 25, 2009) ("as with other discrimination legislation, a plaintiff suing under USERRA does not win by showing prohibited animus by just anyone. He must show that the *decisionmaker* harbored animus and relied on that animus in choosing to take action.").

*See also Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (in Title VII context, plaintiff "must show a nexus" between a co-worker's discriminatory animus and the decision maker's employment decisions). In the instant case, while Slater was either the charging officer or a percipient at the disciplinary hearings, there is no evidence that Slater had any undue influence over the hearing officers' ultimate decisions. Instead, the record reflects that Burgener did in fact commit the rule violations with which he was charged, and that while Burgener and his union may have disagreed with the severity of the penalty assessed, Union Pacific applied the penalty to Burgener as it would have to any other engineer who committed the same infraction during the period in question.[17]

Burgener has not presented evidence of an extensive "pattern of discrimination and retaliation" that would allow a reasonable jury to find in his favor as to his claim under § 4311(b). *See Sheehan*, 479 F.3d at 676. Instead, the only viable evidence supporting his retaliation claim is the temporal proximity between Union Pacific's adverse action and his complaints under USERRA. "While temporal proximity between a complaint and an adverse employment action can, in some cases, be used to survive summary judgment," *Francis*, 452 F.3d at 309, Union Pacific has presented substantial evidence demonstrating that it terminated Burgener for valid, non-discriminatory reasons. Accordingly, Union Pacific's motion for summary judgment with respect to Burgener's claim for retaliation in violation of § 4311(b) will be granted.

---

[17] For the same reasons, the relevance of Burgener's allegation that the Union Pacific employee who handled course enrollment complained to Burgener because that employee had been contacted by the "feds" is of limited import. In addition, during his deposition Burgener stated that he *did not* believe that MOP Slater or the other managers involved in the disciplinary events had discriminated against him based on his military status. *See* Quinn Decl. Ex. D at 125-29.

**IV. ORDER**

Good cause therefore appearing, Union Pacific's motion for summary judgment is GRANTED and Burgener's motion for summary judgment is DENIED.

DATED: April 22, 2009

JEREMY FOGEL
United States District Judge

This Order has been served upon the following persons:

Stephanie Lynn Quinn slq@randolphlaw.net, bmurch@randolphlaw.net, sdarms@randolphlaw.net

Steven L. Herrick SHerrick@tullylegal.com

Thomas A. Cregger tac@randolphlaw.net, bmurch@randolphlaw.net, capodaca@randolphlaw.net, sdarms@randolphlaw.net

Daniel M Mayfield
Carpenter & Mayfield
730 North 1st Street
San Jose, CA 95112

23

Case No. C 07-5160 JF (HRL)
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ETC.
(JFLC1)